**Mary Louise JAKSICH, Plaintiff,**

v.

**THOMSON McKINNON SECURITIES, INC., and Lester Kuznetz, Defendants.**

**No. 81 Civ. 7675 (IBC).**

United States District Court, S.D. New York.

Feb. 10, 1984.

Gruen, Muskin & Thau, New York City, for plaintiff; Victor Muskin, New York City, of counsel.

Hall, McNicol, Hamilton, Clark & Murray, New York City, for defendants; Edward J. Boyle, Ronald S. Herzog, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

The plaintiff in this action is a medical marketing researcher who began investing money in the stock market in 1979 or 1980. Defendant Thomson McKinnon Securities, Inc. ("Thomson") is a securities firm and broker-dealer registered with the Securities and Exchange Commission and is a member of the New York and American Stock Exchanges, the National Association of Securities Dealers ("NASD") and other broker-dealer organizations. Plaintiff had maintained a margin account[1] with the Nanuet, New York office of Thomson from August 1980 until February 1981 when her account was liquidated. The particular broker with whom she dealt was defendant Lester Kuznetz, an employed, registered representative of Thomson at all relevant times.

Plaintiff commenced this action for damages in December 1981 alleging that the manner in which her account had been handled by Kuznetz and Thomson violated section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) ("SEA"); Rules 10b–5 and 10b–16 promulgated under section 10(b); Regulation T, 12 C.F.R. § 220; Rule 405 of the New York Stock Exchange ("NYSE"); Article III, section 2 of the NASD Rules of Fair Practice; and the common law. Defendants counterclaimed for the unsecured debit balance in plaintiff's account when it was liquidated.

The trial to the Court was bifurcated, the issue of liability to be determined first; damages reserved pending our instant determination. Upon all the evidence adduced before us, we adopt plaintiff's findings of fact in their entirety and reject all conflicting findings of fact proposed by defendants.

### Findings of Fact

After inheriting some stocks upon her mother's death, plaintiff opened a brokerage account with Haas Securities ("Haas") in 1979 or 1980, a discount brokerage house in New York City. Through that account, plaintiff purchased a total of six stocks at different times. She maintained a cash account and a margin account at Haas although she did not fully understand how the latter operated. (Tr. 122)[2]

Haas Securities bought and sold stocks but did not offer investment advice. In July of 1980, plaintiff concluded she needed guidance on her investments since, as she testified, "I had suffered some losses from a divorce [and] I wanted guidance to try and reestablish those legal fees, and ... [my fiance and I] were contemplating buying a house, and ... the money would eventually be needed for closing of that residence." (Tr. 17)

Defendant Kuznetz was recommended to plaintiff and her then fiance (now husband), William Durkin, by a friend of Durkin's named Tom Piconi. On July 2, 1980, Durkin met with Kuznetz and Piconi to discuss the possibility of transferring plaintiff's account to Thomson. Durkin related plaintiff's dissatisfaction with the limited scope of business activities, especially the total absence of investment advice, at Haas and the reasons why plaintiff wanted expert guidance in the purchase and sale of securities. He expressed the belief that the stocks in plaintiff's portfolio were worth $7,000 to $7,500 cash value and gave Kuznetz a copy of plaintiff's latest Haas account statement. Durkin knew that Thomson usually required a minimum of $25,000 to open an account. (Tr. 186)[3].

---

1. A margin is the amount paid by a customer who uses the broker's credit to purchase a security. Pursuant to Regulation T, 12 C.F.R. § 220.8, a customer must put up one half of the cash or securities needed for the initial purchase. There are also New York Stock Exchange and brokerage firm minimum requirements for maintaining a margin account. *See Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485, 491 (S.D.N.Y.1977).

2. Throughout this opinion, the letters "Tr." followed by a number in parentheses indicates a particular page number in the trial transcript. The same applies to an "Ex." which refers to a specific exhibit.

3. Kuznetz could fairly have assumed plaintiff's portfolio was worth approximately $20,000. An examination of the Haas account given to him showed: 100 shares of Homestake Mining at

Kuznetz informed Durkin during the meeting that at that time there was no particular stock he could suggest because of the small size of plaintiff's portfolio; that he would give the matter thought and call plaintiff. (Tr. 186–87) Kuznetz gave Durkin two agreements for plaintiff to sign and return: a customer's agreement (Ex. D) and a transfer account agreement (Ex. A). Kuznetz also gave Durkin a "stack" of other papers, the subject matter of which plaintiff was unable to recollect at trial. (Tr. 122–23) Durkin was impressed with Kuznetz and so advised plaintiff. Without apprising Kuznetz, she then signed the agreements and forwarded them to him. (Tr. 191–92)

The next day, July 3, Kuznetz telephoned her. She reiterated to Kuznetz her need and desire for investment guidance as well as her financial goals and told him she was "virtually ignorant as to what was happening." Plaintiff testified that Kuznetz repeated that "he really didn't know of anything that he could put me into," and advised plaintiff "that he would handle the transfer of the account by virtue of the instruments that [she] signed." (Tr. 17) What neither plaintiff nor Durkin knew was that on the afternoon of July 2, after Kuznetz's meeting with Durkin and a day before his telephone call to plaintiff, Kuznetz had purchased 1,000 shares of Health-Chem stock for plaintiff.

Within a few days, Kuznetz called plaintiff again and recommended selling the 100 shares of Homestake stock which were in her portfolio from Haas since "gold stocks were not going to go anywhere." (Tr. 19) After talking to the specialist who Kuznetz said had given him this advice, plaintiff told Kuznetz she did not wish to sell the Homestake shares. Kuznetz proceeded to have a subsequent conversation with the specialist, still believed the stock should be sold, and did in fact sell it on July 7. (Tr. 25) Upon learning this, plaintiff expressed to Kuznetz her dissatisfaction with the sale of

Homestake stock. Kuznetz responded "[t]hat it was the best move [she] could make," to which plaintiff said "okay." (Tr. 28)

About the same time that Kuznetz sold the Homestake stock, he advocated the purchase of Health-Chem stock in which he believed there was "a great deal of opportunity." (Tr. 20) When plaintiff asked how the Health-Chem could be bought without Thomson having received her securities from Haas, Kuznetz assured her "he was going to take care of it." (Tr. 30) Kuznetz then spoke with Durkin about Health-Chem stating that an article had been written regarding Health-Chem products; Durkin said he would read it, then consider purchasing the stock for plaintiff's account. (Tr. 198) It must be borne in mind that at the time Kuznetz had these conversations with plaintiff and Durkin, he did not reveal he had actually purchased the Health-Chem stocks on July 2.

Approximately at the close of July or beginning of August, 1980, Kuznetz called plaintiff and told her the Health-Chem stock "wasn't reacting well;" that he had spoken with Durkin who agreed it should be sold, and he was going to sell it. Kuznetz answered affirmatively plaintiff's query concerning whether they had given Health-Chem enough time to appreciate in value. (Tr. 31)

Soon after this conversation with plaintiff, Kuznetz told her and Durkin about a stock called Reserve Oil: "that many of his customers had been put into it, that he felt very, very strongly about the stock, it was a stock that with pending legislation he thought was going to be a real winner and he would like to put [plaintiff and Durkin] into it. And that he would cover it again." (Tr. 33)

Durkin requested financial figures on Reserve Oil, but Kuznetz stated he did not have that information, whereupon Durkin

---

$66 per share in a cash account; 600 shares of Threshold Technology at $9–$10 per share in a margin account; 100 shares of Texaco at $40 per share in a margin account; and 100 shares

of Wometco in a margin account selling 5 to 22. (Tr. 224–26; Ex. A & B; Plaintiff's Post-Trial Brief at 5) However, $5,000–$6,000 was a margin indebtedness.

looked up the company in Moody's OTC Industrial Manual and ordered a 10K form and an annual report. (Tr. 203) He assessed the stock as being a poor risk and called Kuznetz to express that opinion and to tell him that "I thought he was crazy." (Tr. 205) Kuznetz answered that his opinion was fortified by favorable information from a specialist. Soon after, in early August 1980, Kuznetz called Durkin and notified him that Kuznetz would be putting some Reserve Oil stocks into plaintiff's account. In response to Durkin's expression that it was not "right," Kuznetz said, "Don't worry." (Tr. 205–06) There were also two conversations about purchasing the Reserve Oil stock between plaintiff and Kuznetz prior to the latter's total purchase of 1500 shares of Reserve Oil for plaintiff made in three separate purchases of 500 shares each between August 5–8, 1980 at a total cost of about $49,000–$50,000. (Ex. 4)

The regulation promulgated under the SEA which governs the extension of credit by brokers and dealers provides that brokers may loan no more than 50% of the current market value of a security to each customer. Regulation T, 12 C.F.R. § 220.8. At the time Kuznetz purchased the Reserve Oil, most of plaintiff's money was tied up in margin accounts. The Health-Chem stock had been sold for $13,145.98; since it was a margin account, one half of that amount, $6,572.99, was left to invest in other stocks. The Wometco margin stock which plaintiff had purchased while she was a customer at Haas was sold on August 4, 1980 for $2,142.99; 50% of the market value was $1,071.50. Kuznetz believed that 600 shares of the Threshold Technology was still in plaintiff's margin account, but this was tied up in the stock— not available as a liquid asset. In actuality, 300 shares had been sold for $2,735.69 (Ex. B) of which one-half, $1,367.85, belonged to Haas. (The proceeds of the sale were used to reduce plaintiff's margin debt.) (Tr. 172) Thus, the money in plaintiff's account which was available for other investments at the time that Kuznetz purchased the Reserve Oil was $6,572.99 plus $1,071.50 plus $1,367.85—a total of

$9,012.34 plus some possible leftover proceeds in cash from the Threshhold Technology sale. Even if Kuznetz additionally calculated into this sum the other 300 shares of Threshhold Technology and the 100 shares of Texaco which then sold at about $40 per share, Kuznetz certainly should have been aware that after dividing all this by one-half, plaintiff's account would still be worth only approximately $12,380. *See* L. Loss, Fundamentals of Securities Regulations 719 n. 48 (1983). Yet Kuznetz purchased more than five times this amount of Reserve Oil. Needless to add, the purchase was in excess of the 50% requirement of the SEA.

On cross examination, in response to the question of whether plaintiff accepted the purchase of Reserve Oil, she testified, "Yes, I did." (Tr. 159) However, she realized that she could not afford the purchase. She called Kuznetz and told him that "[w]e can't do this and buy our house," (Tr. 37–38), and that she was upset because she had blindly trusted him with money and future security (Tr. 40). She informed him that she and Durkin wanted to "close on" the house (in which they were then living) based on a 12% mortgage rate given them by a bank and that she wanted to use some of the stock money to cover at least part of the closing costs (Tr. 44). Kuznetz told her he would "take care of it;" "[you] can always put [the stock] back in [my] account;" (Tr. 37–38) "we will worry about it when the time comes. Nobody is bothering me yet . . .;" (Tr. 40) "[you and Durkin will] get out of the stock in time to go to closing on [your] home." (Tr. 45) Plaintiff hung up on Kuznetz.

Kuznetz also spoke to Durkin several times subsequent to the initial purchase of Reserve Oil. Durkin expressed plaintiff's dissatisfaction and asked why Kuznetz had acted without authorization. Kuznetz again resorted to his frequent reassurance: "Don't worry about it." After a number of similar telephone calls, including two in which Durkin requested the stock be sold, Kuznetz slammed the telephone down on Durkin once and in a second conversation

used extremely foul, filthy words (Tr. 212) to Durkin. Finally, in late September 1980, Durkin consulted with an attorney on the matter; no action was taken. (Tr. 208–12)

Kuznetz called plaintiff later that month a few times to "touch base" with her. He informed her that he had not yet received her account from Haas and assured her that as long as he did not receive the transfer, he could protect the position she was in. (Tr. 49) He further told her that due to his purchase of Reserve Oil for many of his customers, "nobody wanted to talk to him." (Tr. 48, 50) Plaintiff informed him that her house closing had been postponed and she was frightened about the prospect of losing the opportunity to purchase the house. (Tr. 50)

Soon after this conversation, plaintiff wrote a letter to Kuznetz asking what he was going to do about her situation. (Ex. 6) Kuznetz, who testified that he never received the letter, did not answer it.

Around late December 1980 or early January 1981 Kuznetz called plaintiff at least once to inform her that the volume in the Reserve Oil stock was active and the stock was performing well. (Tr. 105–06) In fact, as plaintiff knew, the stock had returned at that time to approximately the price at which Kuznetz had purchased it for plaintiff.

The next conversation between plaintiff and Kuznetz took place during the week of February 18, 1981 when Kuznetz told plaintiff to give him the money owing from a margin call on plaintiff's account if she did not want her account to be liquidated. Plaintiff protested, saying she did not want the stock in the first place and Kuznetz had known plaintiff's portfolio was less than the minimum amount Thomson usually required. (Tr. 55)

A few moments later Mr. Sandhaus, a vice president of Thomson and a branch manager at the Nanuet, New York office, called plaintiff back and told her that if she did not pay the money due, her account

would be liquidated. He claimed that Kuznetz acted in her best interests and that she knew what she had been doing. (Tr. 58) Within a few days plaintiff received two confirmations from Thomson addressed to her documenting the sale of her 1500 shares of Reserve Oil and her 100 shares of Texaco (which had been transferred from her account at Haas in November, 1980). (Tr. 59)[4] The liquidation of the account left an unsecured debit balance of $13,007.32.

Kuznetz's testimony parts company with that of plaintiff and Durkin in several respects. Kuznetz contends: that at their July 2nd meeting, Durkin stated that plaintiff's only reasons for transferring her account were Haas' poor execution of its accounts and the couple's desire to make money (Tr. 237–39); that plaintiff and Durkin agreed to the purchase of the Health-Chem stock (Tr. 243); that Durkin gave Kuznetz an order for the purchase of the first and second 500 shares of Reserve Oil (Tr. 245, 249); that Durkin never protested the purchase of the Reserve Oil stock and Kuznetz never had to reassure Durkin (Tr. 250); that since the stock increased in price within two days of the purchase of the 1,000 shares, Durkin and plaintiff agreed to sell the Health-Chem and take a small loss in order to buy another 500 shares of Reserve Oil (Tr. 252); that Durkin and Kuznetz talked two to three times per week throughout September, October and November 1980 and more often in December 1980 and January 1981 (Tr. 256); that Kuznetz never said that if plaintiff encountered problems with the Reserve Oil stock he would move it into his own account (Tr. 264); that Kuznetz's only reference to "covering" for plaintiff was in the context of saying her Haas account, which was being transferred, would cover her Reserve Oil purchases (Tr. 265); and that Kuznetz never hung up the telephone on Durkin or used curse words when speaking to him (Tr. 266–67).

---

4. The other 300 shares of Threshold Technology had been sold before the transfer of plaintiff's account from Haas to Thomson had been effected.

As we have already indicated, we adopt as true and convincing the version of the facts revealed by plaintiff and the proof adduced in her behalf. We make short shrift of Kuznetz's testimony: We declare it totally unpersuasive and unconvincing. We unhesitatingly reject it *in toto*. The testimony of the other witnesses for the defendants was unimpressive.

The trial record compels our firm conclusion that throughout the time period during which he handled plaintiff's account, Kuznetz disclosed an appalling shoddiness and lack of sensitivity; he reached a high point of deplorable inconsiderateness. His knowledge of the intricacies of the business gave him an enormous advantage over her, and in another sense, enabled him to take advantage of her.

Despite our considered estimate of the totality of the proof adduced, we must painstakingly hold, as a matter of law, that plaintiff may not recover her losses from the defendants; neither is she liable for the debit balance in her account when it was liquidated.

## The Law

Plaintiff alleges that Kuznetz's acts of buying the Health-Chem and the Reserve Oil stocks and selling the Homestake stocks without authorization and of continually assuring that he would "take care" of the situation constituted violations of section 10(b) of the SEA and Rule 10b–5 promulgated thereunder; NYSE Rule 405; and Article III, section 2 of the NASD Rules of Fair Practice. Plaintiff further claims that Thomson's rules and policies concerning margin accounts were not furnished in writing to plaintiff, and the company therefore violated Rule 10b–16 promulgated under section 10(b) of the SEA as well as Rule 10b–5. Third, it is alleged that the excessive margin debts incurred in plaintiff's account despite plaintiff's protests and lack of approval violated Regulation T, 12 C.F.R. § 220. Finally, plaintiff complains that the acts by the defendants hereinabove mentioned constituted common law fraud and breach of fiduciary duty and caused plaintiff to suffer severe emotional distress.

### Rule 10b–5

Congress enacted the SEA in order to encourage public participation in the stock market by protecting investing members of the public from fraud and manipulation of stock prices, *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F.Supp. 915, 921 (D.Conn.1977), and to provide "a high standard of business ethics ... in every facet of the securities industry." *United States v. Naftalin,* 441 U.S. 768, 775, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979) (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–87, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)); *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981); *E.F. Hutton & Co., Inc. v. Penham,* 547 F.Supp. 1286, 1295 (S.D.N.Y. 1982). In accordance with these goals, section 10(b)[5] of the Act, 15 U.S.C. § 78j(b), and Rule 10b–5[6] promulgated thereunder

---

**5.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**6.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange,

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in

by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1979), were designed to prohibit fraudulent, manipulative and deceptive schemes in connection with the purchase or sale of any security.

■ The elements requisite to a claim under Rule 10b–5 are: (1) a misrepresentation or omission of material facts by a defendant; (2) in connection with the purchase or sale of a security; (3) detrimental reliance by plaintiffs on the misrepresentations or omissions; and (4) scienter on the part of defendants in making the misrepresentations and omissions.[7] *See First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314–15 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Penham, supra,* at 1295; *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981); *Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485, 503 (S.D.N.Y.1977). We will examine each element separately to determine whether Kuznetz and Thomson violated section 10(b) and Rule 10b–5.

■ The first factor requires the defendants to have misrepresented or omitted material facts to the plaintiff. A misrepresentation may be defined as a false statement; an omission is constituted by silence when a defendant has a duty to speak. *See First Virginia Bankshares, supra,* at 1314; *Coons v. Kidder, Peabody & Co., Inc.,* 539 F.Supp. 1145, 1146 (S.D.N.Y. 1982). It is also essential that the misrepresentation or omission concerns material facts. Materiality is established when "a reasonable man would attach importance to the alleged omissions [or misrepresentations] in determining his course of action." *In re New York City Municipal Securities Litigation,* 87 F.R.D. 572, 579 (S.D.N.Y.

1980) (quoting *Titan Group, Inc. v. Faggen,* 513 F.2d 234 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975)).

■ We find that Kuznetz made two material misrepresentations to plaintiff. First, Kuznetz's call to plaintiff on July 3, 1980 in which he told her that he did not yet have any ideas concerning stocks which would be appropriate for her, when in actuality he had purchased the Health-Chem the day before, was a material misrepresentation. Indeed, if plaintiff knew before she opened an account with Thomson that Kuznetz would invest her money in a manner unsatisfactory to her, she might very well have taken her business elsewhere. Second, Kuznetz's statements to plaintiff and Durkin implying that plaintiff could afford the Reserve Oil purchases because Kuznetz would "cover" for her or because plaintiff could put the stock in his account, or because plaintiff's account had not yet been received from Haas, were misrepresentations, the truth of which, had it been known, very likely may have altered plaintiff's actions. These two purchases, therefore, violated the first prong of the Rule 10b–5 test.

We do not find that Kuznetz's sale of the Homestake stock was a material misstatement or omission. Plaintiff did not prove that Kuznetz's poor opinion of Homestake was a misrepresentation; the fact that the stock went up soon after Kuznetz had sold her shares is part of the gamble any stock market participant takes, whether investor or broker.

■ Plaintiff also claims that defendant failed to inform her of Thomson's market-maker status regarding the Reserve Oil stock.[8] If plaintiff was correct, such an

connection with the purchase or sale of any security.

**7.** A fifth element of a 10(b) action is that the defendants used "any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange," 15 U.S.C. § 78j(b). *See Penham, supra,* at 1295; *Weitzman v. Stein,* 436 F.Supp. 895, 902 (S.D.N. Y.1977). Since the actions at issue in the instant case all took place through the office of

Thomson, a firm registered with the Securities and Exchange Commission and a member of several national securities organizations, we readily find that this fifth element is satisfied.

**8.** A market-maker is a "broker-dealer who holds himself out 'as being willing to buy and sell [a] security for his own account on a regular or continuous basis.'" L. Loss, Fundamentals of

**494**

omission would be material. *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171–72 (2d Cir.1970) (brokerage firm's statement in confirmation slips that it was acting as principal for its own account without stating that it was "making a market" in the securities was a material omission in violation of Rule 10b–5). However, Thomson's position as a market-maker was written on the account statements plaintiff received at the end of each month. (Ex. 4 and 8) We find that this procedure was enough to alert plaintiff of Thomson's market-maker status.[9]

■ The second element necessary to a finding of liability under Rule 10b–5 is that the misrepresentation or omission be in connection with the purchase or sale of a security. The Supreme Court has found that the "in connection with" phrase must be construed liberally to encompass practices "touching" the sale of securities. *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971). Following the Court's guidance, our Circuit Court has held that where the achievement of a fraud is directly related to the trading process, the "in connection with" requirement is met. *United States v. Newman*, 664 F.2d 12, 18 (2d Cir.1981); *Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 815 (2d Cir.1975); *see Natowitz v. Mehlman*, 567 F.Supp. 942, 946–47 (S.D.N.Y.1983). Since Kuznetz's material misrepresentations di-

rectly concerned the *purchase* of the Health-Chem and Reserve Oil stocks, the "in connection with" requirement is clearly satisfied.

The material misrepresentations must be in connection with the "purchase or sale of a security." Under the SEA, a purchase is "any contract to buy, purchase or otherwise acquire" securities, 15 U.S.C. § 78c(a)(13) (1976) and a sale is "any contract to sell or otherwise dispose of" securities, 15 U.S.C. § 78c(a)(14) (1976). Technically, therefore, Kuznetz's purchase of the Health-Chem stock prior to the receipt by Thomson of plaintiff's copy of the customer agreement, *i.e.*, before plaintiff ever actually contracted with Kuznetz or Thomson, did not constitute a purchase under the statute; the stock was not bought pursuant to "a contract to ... acquire" securities. However, the Supreme Court has declared on several occasions that the SEA is to be construed flexibly. *Superintendent of Insurance, supra*, 404 U.S. at 12, 92 S.Ct. at 169; *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284–85, 11 L.Ed.2d 237 (1963); *see Penham, supra*, at 1295; *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1093 (S.D.N.Y.1977), *aff'd*, 636 F.2d 1201 (2d Cir.1980). To find that the purchase of Health-Chem was not the type of "purchase" contemplated by the SEA (plaintiff testified that she accepted the purchase after being informed of it (Tr. 159) and when it was a stock in her account for a

Security Regulation 675 (1983) (quoting SEA section 3(a)(38)).

**9.** Plaintiff also contends that defendants failed to provide her with the company's rules and policies concerning margin accounts and that this failure constituted a material omission in violation of Rule 10b–5. As we explain more fully in the section of this opinion which addresses Rule 10b–16, we find that plaintiff has not proven this allegation by the requisite preponderance of the evidence. Our conclusion with respect to Rule 10b–5 is supported by the fact that plaintiff had maintained a margin account at Haas and had read and talked to the broker there about the information demonstrating "the meaning of the debit balance, how interest is computed, [and] the rights of the firm with respect to a liquidation of the account in

the event [the customer] failed to maintain a certain equity level." (Tr. 87–88) It is a well-settled rule that "there is no duty to disclose information to one who reasonably should already be aware of it." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978), (quoting *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)); *Penham, supra*, at 1296; *Klamberg v. Roth*, 473 F.Supp. 544, 552 (S.D.N.Y.1979). Since plaintiff knew of the consequences of maintaining a margin account prior to becoming a customer of Thomson, defendants' duty to provide her with this information, the non-performance of which would constitute a material omission, was at least less than defendants' duty toward new customers without prior margin accounts.

few weeks) would be to put form above substance—an approach we decline to follow. Accordingly, we find that the purchase of both the Health-Chem and Reserve Oil [10] stocks were "in connection with the purchase or sale of a security."

■ The third requirement of a Rule 10b–5 cause of action is detrimental reliance by a plaintiff on a defendant's misrepresentations and omissions. If a misrepresentation is material, reliance on the part of the purchaser may be presumed. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 553 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1972); *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 239–40 (2d Cir.1974); *Koenig v. Smith*, 88 F.R.D. 604, 607 (S.D. N.Y.1980). In essence, our Circuit recognizes that both the reliance and materiality requirements are forms of "transaction" causation, *i.e.*, "a reasonable investor might have considered [the actual facts] in the making of this decision." *Affiliated Ute, supra*, 406 U.S. at 154, 92 S.Ct. at 1472; *see Koenig, supra*, at 607. Since we have already found that the misrepresentations by Kuznetz were material, the reliance requirement is also satisfied.

Additionally, we are reminded that Kuznetz continually attempted to reassure plaintiff and Durkin throughout the summer and autumn of 1980 that he would "take care" of their account. We find that these facts support and strengthen our conclusion that to her detriment plaintiff relied on Kuznetz for the purchase of Health-Chem and Reserve Oil.

The final factor in a Rule 10b–5 analysis is that the defendants made the misrepresentations with scienter. "Scienter" is defined as "intent to deceive, manipulate,

or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). The Second Circuit Court of Appeals has extended the definition to include reckless conduct, described as "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rolf v. Blyth, Eastman Dillon & Co. Inc.*, 570 F.2d 38, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)).

We find that the purchase by Kuznetz of the two securities was, at the very least, reckless conduct. Surely a registered securities representative with fifteen (15) years experience as a stockbroker (the last eight with the defendant Thomson) (Tr. 233–34) should have known that he had a duty to clearly and plainly notify plaintiff about the Health-Chem purchase at the time he bought the stock for her. Further, he should have known that the purchase of Reserve Oil would have required more money in plaintiff's margin account than then existed.

The stock purchases were therefore "highly unreasonable." Kuznetz well knew what he was doing; his actions were not within the realm of ordinary care by any stretch of the imagination.

■ Accordingly, we find that Kuznetz's purchase of the Health-Chem and of the Reserve Oil stocks were in violation of section 10(b) of the SEA and Rule 10b–5.

*Churning in Violation of Rule 10b–5*

■ Plaintiff also contends that Kuznetz churned her account which, if proven, would evince his use of a defrauding or deceptive device in violation of Rule 10b–5. *See Newburger, Loeb & Co., Inc. v. Gross,*

---

**10.** Although the record is unclear as to when defendants received plaintiff's customer agreement, there is no suggestion that this contract was not received prior to the purchase of the Reserve Oil stock. Thus, plaintiff was a purchaser of the Reserve Oil.

563 F.2d 1057, 1069 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Fey v. Walston*, 493 F.2d 1036, 1045 (7th Cir.1974); *Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 400 (S.D.N.Y.1976). A customer's account is "churned" when his or her broker-dealer induces excessive transactions in the customer's account for the broker-dealer's personal gain. *See* 17 C.F.R. § 240.15cl-7(a); *Newburger, Loeb, supra*, at 1069; *Zaretsky v. E.F. Hutton & Co., Inc.*, 509 F.Supp. 68, 74 (S.D.N.Y.1981). Such conduct is usually characterized by "in and out" trading through which the broker generates many commissions. *See Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F.Supp. 591, 595 (S.D.N.Y.1981).

█ Plaintiff has failed to show that Kuznetz "churned" her account. During the entire eight months in which plaintiff maintained an account at Haas, Kuznetz only bought two different stocks for her. His actions, although far from being clean and straightforward, we are quite convinced, were not motivated by high commissions as the sole incentive. *Cf. Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203, 206–08 (D.Mass.1978) (broker traded 21.5 times per month and securities were sold a few days after purchase without significant price changes; cause of action for churning established).

We conclude, therefore, that plaintiff's allegation of churning on the part of defendants in violation of Rule 10b–5 has not been established; the proof fails to sustain that particular cause of action.

*Defenses to Section 10(b) and Rule 10b–5*

Defendants contend that even if their actions did constitute violations of section 10(b) and Rule 10b–5, the plaintiff is estopped from maintaining this action since she ratified and approved Kuznetz's acts and thereby alleviated the defendants from accountability.

We first consider Kuznetz's purchase of Health-Chem. We find that although it was bought without authorization, plaintiff did not object to its purchase. In fact, plaintiff received a confirmation of the Health-Chem purchase [11] (Ex. 1) which specifically stated: "Trade Date: July 2, 1980." Thus, plaintiff knew that Kuznetz bought the stock for her before she opened an account with Thomson, but she failed to assert an objection.

The doctrine of ratification has been defined and illustrated as follows:

> Ratification is a theory of agency in which a principal adopts a previous action performed by an agent in the principal's name, but which prior action would not bind the principal absent the ratification because the act as originally done was without authority.... For example, assume Investor instructs Broker-Dealer to purchase 100 shares of Acme Corporation stock for a total purchase price of $10,000. Instead of buying Acme's stock, as ordered, Broker-Dealer purchases 100 shares of Beta Corporation stock for a total price of $15,000. When Investor receives the confirmation slip two choices are open: (1) immediately disclaim the transaction as being unauthorized; or (2) elect to ratify the transaction, in which instance the previously unauthorized action of Broker-Dealer becomes ratified ...[12]

S. Goldberg, 2 Fraudulent Broker-Dealer Practices 11–39 (1978). *See Altschul v. Paine, Webber, Jackson & Curtis*, 518

---

**11.** The date on which plaintiff received the confirmation is unclear.

**12.** The author additionally states that the ratification defense is usually used by a principal to take advantage of an agent's previously unauthorized act or by a third party to hold a principal liable for the agent's unauthorized act. He suggests that in a situation where a broker-dealer has purchased securities without authorization of the investor, the latter should be said to have adopted the transaction and waived potential legal action against the seller. S. Goldberg, 2 Fraudulent Broker-Dealer Practices 11–39—11–40 (1978). However, we find the illustration given in Goldberg's definition of "ratification" to be quite analogous to the instant fact pattern. Accordingly, we find that ratification is the appropriate theory to use with respect to plaintiff's reactions (or lack thereof) to the Health-Chem purchase.

F.Supp. 591, 594 (S.D.N.Y.1981) (plaintiffs' failure to object to defendant's course of trading for two years, until the risk failed, despite ample opportunity to so object, constituted ratification); *Ferguson v. Francis I. duPont & Co.*, 369 F.Supp. 1099, 1101 (N.D.Tex.1974) (although broker did not follow customer's orders in purchasing and selling several securities, customer, who had experience in the stock market before dealing with defendant, had many opportunities to stop doing business with broker, and his failure to so act ratified broker's conduct).

Plaintiff's failure to object to Kuznetz's unauthorized purchase of Health-Chem even after she became aware of his action and had the opportunity to object constituted ratification of Kuznetz's conduct. Defendants are therefore not liable under section 10(b) or Rule 10b–5 for Kuznetz's Health-Chem purchase on plaintiff's behalf.

Regarding Kuznetz's purchase of shares of Reserve Oil in excess of an amount that plaintiff could afford, we find that plaintiff waived her right to assert a claim. As we stated in a previous opinion:

> [T]he instructions to the jury on waiver ... referred to the period between the time when plaintiffs knew, or reasonably should have known, the true facts, and the time when they took action.... 'The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.'

*Black v. Riker-Maxson Corp.*, 401 F.Supp. 693, 699 (S.D.N.Y.1975) (quoting *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213–14 (9th Cir.1962)).

Although Kuznetz acted less than honorably, it can hardly be said that plaintiff was without fault. She knew that the Reserve Oil purchase was beyond her financial capabilities: her stock market experience was not extensive but also was not completely inadequate, for example, prior to her margin account at Thomson she had invested in a similar account at Haas; she received monthly statements from Thomson confirming the status of her account; and she knew enough to expressly tell Kuznetz "[w]e can't afford this purchase." (Tr. 37)

Plaintiff's knowledge of Kuznetz's conduct alone did not destroy her innocence; in fact, had her objections to the broker's actions continued until liquidation, even if she had not taken affirmative action to contest the legality of Kuznetz's purchases on her behalf, waiver would have been much more difficult to establish. The facts as we find them, however, indicate that plaintiff ceased objecting—in fact, ceased communicating—with Kuznetz throughout October, November and December 1980, and in the beginning of January 1981, there was at least one "optomistic" telephone call (Tr. 106) to which plaintiff admits she "may" have said "Thank God it's finally starting to move." (Tr. 108) Indeed, throughout the time period when the stock had begun to climb to the price at which plaintiff had bought it, *i.e.*, late December 1980 to early January 1981 plaintiff did not object to owning it. In essence, at that point, she was "riding the market" and hoping to gain financially through her Reserve Oil stock.

Plaintiff's knowledge of the wrong combined with her failure to object when the stock prices rose demonstrate her lack of innocence and her waiver of the Rule 10b–5 claim. *See Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1050 (7th Cir.1974); *Black, supra*, at 699. In essence:

> If indeed plaintiffs, upon learning of the alleged misrepresentations ... could have sold their shares for a price equal to or more than their purchase price and failed to do so, they should properly bear the consequences. They are not entitled to speculate with the defendants' money ...

*Marth v. Industrial Incomes Inc. of North America*, 290 F.Supp. 755, 759 (S.D.N.Y. 1968).

Accordingly, plaintiff was on such clear notice as to preclude recovery under section 10(b) and Rule 10b–5.

*Regulation T*

Plaintiff also contends that defendants are liable under Regulation T, 12 C.F.R. § 220. As we have already noted, Regulation T was promulgated under the authority of section 7 of the SEA and concerns credit extension by brokers and dealers. Regulation T provides, *inter alia,* that no more than 50% of the current market value of a security may be loaned by a broker to a customer. 12 C.F.R. § 220.8. We find that plaintiff has no private right of action under this regulation.

An individual's right to maintain a private right of action under Regulation T was substantially altered by the addition by Congress of subsection (f) to section 7 of the SEA in 1970. Subsection (f) prohibits both stockbrokers from extending credit beyond the margin limits set forth by the Federal Reserve Board and investors from accepting such illegal extensions. 15 U.S.C. § 78g(f). The subsection provides, in relevant part:

> It shall be unlawful for any United States person ... to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender ... for the purpose of (A) purchasing or carrying United States securities ... if, under this section or rules or regulations prescribed thereunder, the loan or other credit transaction is prohibited.

Before subsection (f) was added to section 7, the Court of Appeals for the Second Circuit had held that "private actions by market investors are a highly effective means of protecting the economy as a whole from margin violations by brokers and dealers." *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1140 (2d Cir.1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (*"Pearlstein I"*). Subsequent to the statutory addition, the Court of Appeals heard reargument on *Pearlstein* and noted that subsection (f) "cast doubt on the continued viability of the rationale of [*Pearlstein I*]," 527 F.2d 1141, 1145 n. 3 (2d Cir.1975).

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Supreme Court provided a four part test to determine whether a private right of action may be implied in a statute which does not contain such a clause: (1) The plaintiff must be a member of the class the statute is intended to protect; (2) there must be a legislative intent to create a private remedy; (3) a private remedy must be consistent with the legislative scheme; and (4) the cause of action must be one which is not traditionally relegated to state law.

Applying the *Cort v. Ash* factors, the district courts in our Circuit have held on a number of occasions that section 7 does not permit a private right of action. *See Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 465 F.Supp. 1233 (S.D.N.Y. 1979); *Establissement Tomis v. Shearson Hayden Stone, Inc.,* 459 F.Supp. 1355, 1360 (S.D.N.Y.1978); *Nussbacher v. Chase Manhattan Bank,* 444 F.Supp. 973, 980–81 (S.D.N.Y.1977). The courts found that section 7 was created to protect the economy as a whole from excessive market speculation; it was not enacted for the benefit of individual investors. *Siedman, supra,* at 1238; *Establissement Tomis, supra,* at 1360; *Nussbacher, supra,* at 980. The *Establissement Tomis* case further stated that congressional silence on the issue indicates the intent of Congress not to provide a private remedy. *Id.* at 1360. Finally, the cases argued that implying a private right of action into the statute might encourage margin violations by investors desirous of increasing their profits and who, if called to account, could pin the blame on their brokers. *See Pearlstein I,* 429 F.2d at 1148–49 (Friendly, J., dissenting); *Establissement Tomis, supra,* at 1360; *Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485, 501 (S.D.N.Y.1977).

In contrast, the courts in *Panayotopulas v. Chemical Bank,* 464 F.Supp. 199 (S.D.N.Y.1979) and *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F.Supp. 915 (D.Conn.1977), found that protecting small investors was a by-product of the statute's broader goal of regulating credit makers. In fact, both courts stated that "private actions by investors are an effective means

of protecting the national economy from margin infringements." *Panayotopulas, supra,* at 202–03; *Palmer, supra,* at 921. The two courts concluded that a private right of action lies when an investor acts in good faith, *i.e.,* without wilfully or intentionally accepting credit in violation of margin limitations set forth under Regulation T, and when the investor, after discovering the margin violation, takes prompt "practicable" action to remedy the lack of compliance. *Panayotopulas, supra,* at 202; *Palmer, supra,* at 921–22.

We are inclined to agree with the less stringent reading given to section 7 by the courts in *Panayotopulas* and *Palmer.* We find plaintiff did not demonstrate the requisite good faith or "practicable" action promptly after realizing that the Regulation T requirements had been violated.

Plaintiff may have believed that her numerous and vehement objections immediately after the Reserve Oil was purchased were "practicable" actions which remedied her part in the margin violations. She was aware that Kuznetz did not act in accordance with her (or Durkin's) instructions, yet took no affirmative action to dispose of the stock: for instance, she did not complain to Kuznetz's superior; she did not attempt to transfer her account to a different brokerage house. Indeed, plaintiff admitted that she accepted the Reserve Oil purchase (Tr. 159). Finally, and significantly (as we have already noted) plaintiff even ceased objecting to the purchase of the stock when its price rose.

Accordingly, we find plaintiff did not meet the requirements permitting a private right of action under the less stringent reading of Regulation T.

*NYSE and NASD Rules*

Plaintiff next contends that defendants are liable for violating NYSE Rule 405 and Article III, Section 2 of the Rules of Fair Practice of the NASD.

Rule 405 provides, in relevant part:

Every member organization is required through a general partner, a principal executive officer or a person or persons designated [as qualified principals or employees] to

(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

Supervision of Accounts

(2) Supervise diligently all accounts handled by registered representatives of the organization.

Article III, section 2 (the "suitability" rule) provides:

In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer on the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

In order to determine whether plaintiff may maintain a private right of action under these rules, we must once again turn to the four factor test pronounced in *Cort v. Ash.* In doing so, we are in accord with the interpretations of these rules given by our Court in several other cases. *See Juster v. Rothschild, Unterberg, Towbin, Gruntal & Co.,* 554 F.Supp. 331, 333 (S.D.N.Y.1983); *Colman v. D.H. Blair & Co., Inc.,* 521 F.Supp. 646 (S.D.N.Y.1981); *Klitzman v. Bache Halsey Stuart Shields, Inc.,* 499 F.Supp. 255 (S.D.N.Y.1980).

Congress did not intend these rules to permit private rights of action. The legislative history of sections 78f(b)(5) and (6) and 78o–3(b)(6) and (7), the statutes on which Rule 405 and Article III section 2 are grounded, neither mention private remedies nor confer any rights or prohibit any conduct by member organizations. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 571, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979) (omission of provision for private right of action in section 17(a) of SEA reinforced Supreme Court's decision not to

find such a right); *Colman, supra,* at 654; *Klitzman, supra,* at 259. Furthermore, the SEA creates private remedies under some circumstances, indicating that Congress intended to exclude them in unlisted circumstances. *See Touche Ross, supra,* 442 U.S. at 571–72, 99 S.Ct. at 2486–87 ("when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly"); *Colman, supra,* at 654. A third reason supporting our conclusion is that the self-regulation and self-enforcement procedures in the SEA suggest that no other remedies were intended. *See Colman, supra,* at 654; *see also Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) ("In view of these express provisions for enforcing the duties imposed by section 204 [of the Investment Advisors Act], it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'") (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting)). Because we find that the legislative intent and scheme did not provide a private right of action to the plaintiff, *see Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088 (second and third factors), it is irrelevant whether the stock exchange and association rules were created for the "especial benefit" of people like plaintiff. *Id. See Touche Ross, supra,* 442 U.S. at 575–76, 99 S.Ct. at 2489. Therefore, under the test in *Cort v. Ash* plaintiff may not maintain a right of action for damages based on NYSE Rule 405 and Article III, section 2 of the NASD rules.[13]

Further, plaintiff cannot maintain a private right of action under these rules on the basis of *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). In *Colonial,* the plaintiff alleged that defendant failed "to conduct its dealings in a manner 'consistent with just and equitable principles of trade'" within the meaning of, *inter alia,* some sections of the NYSE and NASD rules. In deciding whether courts could imply liability for violation of these rules, the Second Circuit concluded that

> the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law. Although [the rules here at issue] do impose a duty upon members not to engage in conduct inconsistent with fair and equitable principles of trade ... they are something of a catch-all which Congress could well not have intended to give rise to a legal claim.

*Id.* at 182.

Applying NYSE Rule 405 and Article III, section 2 of the NASD rules to the *Colonial* reasoning, the Court in *Colman* found that the former rule "imposes only very general obligations which are essentially imposed by the Act and by common law, and is thus an inappropriate basis for the implication of a private right of action," and the latter "lacks the requisite precision in defining rights and obligations to satisfy the *Colonial* standard, and adds little or nothing to duties imposed by statute or by the common law." *Colman, supra,* at 655. *See Plunkett v. Dominick & Dominick, Inc.,* 414 F.Supp. 885, 890 (D.Conn.1976). We agree with the analysis of the *Colman* Court.

---

**13.** The fourth factor of the test in *Cort v. Ash,* that the cause of action be traditionally relegated to state law, has rarely been addressed in the cases since an analysis of the first three factors usually is determinative of whether a private right of action exists. Our conclusion against such a private right of action in this case is further supported by the opinion of the District of Columbia Circuit Court of Appeals that with respect to the fourth factor in *Cort v. Ash,* appellants' claim under NYSE Rule 412 could be brought as a common law action for breach of contract or tort. *Sacks v. Reynolds Securities, Inc.,* 593 F.2d 1234, 1245 (D.C.Cir.1978).

We conclude that plaintiff has no implied private right of action against defendants under the NYSE or NASD rules.

*Rule 10b–16*

Plaintiff claims that defendants violated Securities and Exchange Commission Rule 10b–16, 17 C.F.R. § 240.10b–16,[14] promulgated under the authority of section 10(b) of the SEA, by not informing plaintiff in writing what the interest rates would be or when additional collateral might be required or how defendants would determine that plaintiff had an excessive debit balance.

After carefully considering plaintiff's 10b–16 contention, we find that she has not proven, by a fair preponderance of the credible evidence, a violation of the Rule.[15] This is evident by her testimony on cross-examination regarding the documents she received from Thomson McKinnon when she opened her account:

Q: Did you receive [margin account information indicating the meaning of the debit balance, how interest is computed, the rights of the firm with respect to a liquidation of the account in the event you failed to maintain a certain equity level] from Thomson & McKinnon ... [in] July 1980, when you opened a margin account at Thomson McKinnon?

A: I don't know what papers I received were exactly.

Q: Did you review them?

A: I read them.

Q: Do you recall whether or not you received any information dealing with the computations of margins?

A: I really don't know what was in the stack of papers that I signed, other than there was a transfer of the account, and some other documents that Mr. Kuznetz told Mr. Durkin he needed me to sign, complete and return.

Q: You can't tell whether or not one way or the other, whether or not you received such information?

A: No, I can't. (Tr. 122–23)

■ Plaintiff has failed to prove that she did not receive from defendants any written information regarding Thomson's interest rates, requirements for additional collateral or determinations of excessive debit balances. Had she met her burden of proof, the testimony of Sandhaus that Thomson had no procedure whereby customers were given such information (Tr. 87) would have strengthened her argument. However, included in plaintiff's "stack" of papers may have been documents explaining, for instance, standards by which these rates, requirements and decisions were ascertained. *See, e.g., Stephens v. Reynolds Securities, Inc.,* 413

**14.** Rule 10b–16 provides:

(a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer (1) is given or sent at the time of opening an account, a written statement or statements disclosing (i) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of interest that can be imposed; (iii) the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extension of credit, if any, will be made and under what conditions; and (vii) the

nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required.

**15.** Our research has revealed only one case in which a federal court, finding that sufficient facts had been shown, addressed the application of Rule 10b–16 on the merits. *See Stephens v. Reynolds Securities, Inc.,* 413 F.Supp. 50 (N.D. Ala.1976). *Cf. Liang v. Dean Witter & Co., Inc.,* 540 F.2d 1107 (D.C.Cir.1976) (general interpretation of Rule 10b–16 with remand to district court to find necessary facts); *Haynes v. Anderson & Strudwick, Inc.,* 508 F.Supp. 1303, 1318–21 (E.D.Va.1981) (defendant's motion to dismiss on grounds that no implied right of action exists under 10b–16 denied); *Establissement Tomis v. Shearson Hayden Stone, Inc.,* 459 F.Supp. 1355, 1361 (S.D.N.Y.1978) (no private right of action under Rule 10b–16).

F.Supp. 50, 51–52 (N.D.Ala.1976) (Truth-in-Lending statement given to customer with Customer Agreement indicated that annual rate of interest on customer's debit balance was determined by broker's call money rate in New York City, actual interest rate would be at least one half of one percent above the call rate, and customer given specific figures by which to calculate interest). Since we do not know what information plaintiff received from defendants before she opened her account, we cannot undertake to decide whether Rule 10b–16 was violated.

### Common Law Claims [16]

#### 1. Fraud

Plaintiff alleges that defendants are liable for their conduct under the common law concept of fraud.

 The elements of fraud under New York law are: (1) material misrepresentation of fact, (2) scienter, (3) justifiable reliance on the part of the plaintiff, (4) causing injury to the plaintiff. *See Idrees v. American University of the Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y.1982); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1359–61 (S.D.N.Y. 1982); *Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 403 (S.D.N.Y. 1976), *aff'd*, 560 F.2d 547 (2d Cir.1977). Plaintiff has the burden of proving these elements by clear and convincing evidence, a heavier burden to satisfy than the preponderance of the evidence standard used in actions for fraud under section 10(b) of the SEA and Rule 10b–5. *See Van Alen, supra*, at 403.

 We need not, however, address the question of whether plaintiff has satisfied her burden of proof to establish common law fraud, since we find that even if she has, her failure to object to the Health-Chem stock ratified its purchase (as we stated above), and her conduct in holding onto the Reserve Oil stock, particularly during the period when its price rose, constituted a waiver of her claim. *See DuPont v. Perot*, 59 F.R.D. 404, 412–13 (S.D. N.Y.1973) ("When the benefits of a contract are retained with knowledge of the fraud, the defrauded party waives his right to damages for the fraud.")

Plaintiff therefore has no right to damages under common law fraud.

#### 2. Breach of Fiduciary Duty

Plaintiff contends that defendants' actions constituted a breach of their fiduciary duties.

 Under New York law, brokers maintain fiduciary duties to their customers, and the relationship between the two parties is one of principal and agent. *See Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 946 (S.D.N.Y.1979); *Gilman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 93 Misc.2d 941, 944, 404 N.Y.S.2d 258, 262 (Sup.Ct.1978). An agent who accepts the conduct of his or her principal, whether or not the acceptance is inconsistent with the agent's prior instructions, ratifies the principal's transaction, thereby releasing the latter from liability. *See Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F.Supp. 591, 594 (S.D.N.Y.1981) (broker/customer relationship); *Transfer Products Co. v. United Parcel Service, Inc.*, 105 Misc.2d 1022, 1023, 430 N.Y.S.2d 209, 210 (Civ.Ct.1980) (shipper/carrier relationship).

 As we have repeatedly emphasized, plaintiff ratified and waived the purchases of the stocks. Her inaction negated recovery under breach of fiduciary duty.

#### 3. Emotional Distress

Plaintiff's final allegation is that the defendants' conduct caused her to suffer severe emotional distress requiring medical attention.

 We first note that this claim is essentially one for damages which we reserved pending the outcome of the issue of liability. Second, our Court, applying New

---

**16.** In accordance with the provision in the Customer's Agreement herein which plaintiff signed (Ex. D & E), the law of the state of New York governs plaintiff's common law claims.

York law, has found that damages for emotional distress do not lie in an action alleging brokerage mismanagement of a plaintiff's account in violation of 10b–5 and common law. *See Dujack v. Bear, Stearns & Co.*, 481 F.Supp. 172, 173 (S.D.N.Y.1979). The Court in *Dujack* based its finding on the principle that recovery for emotional distress does not lie when a plaintiff merely learns of monetary loss caused by another's negligence, *see Stahli v. McGlynn*, 47 A.D.2d 238, 366 N.Y.S.2d 209 (2d Dept. 1975); *Van Patten v. Buyce*, 37 A.D.2d 448, 326 N.Y.S.2d 197 (3d Dept.1971), even when a defendant knows that the particular plaintiff may suffer an extreme reaction to the loss. *Dujack, supra*, at 173.

We are compelled to find against plaintiff on her emotional distress claim. In short, we find that defendants are not liable for common law fraud, breach of fiduciary duty, or emotional distress suffered by the plaintiff.

### Defendants' Counter-Claim

In their counter-claim, defendants request damages for plaintiff's failure to pay the $13,007.32 debit balance when her account was liquidated.

As we have stated at length, we are appalled by defendant Kuznetz's conduct from the very first day he talked with Durkin. We believe his purchase of stock for plaintiff was made in bad faith and in violation of section 10b–5 of the SEA. Indeed, had plaintiff not waited through the period when the stock prices rose until liquidation of her account, defendants would have been liable under this Rule.[17]

■ To recognize any merit in the counter-claim would certainly violate the letter and spirit of the protections conferred by Rule 10b–5 and overwhelmingly would fail to serve the interests of justice. Accordingly, we invoke the equitable doctrine of "unclean hands" in our determination to reject defendants' counter-claim.

Our conclusion is in accord with decisions arrived at by courts finding that the doctrine of "unclean hands" "will better promote the objectives of the securities laws by increasing protection afforded the investing public." *Wolf v. Frank*, 477 F.2d 467, 474 (5th Cir.1973), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); *see Bertoglio v. Texas International Co.*, 488 F.Supp. 630, 663 (D.Del.1980); *see also Nathanson v. Weis, Voisin, Cannon, Inc.*, 325 F.Supp. 50 (S.D.N.Y.1971).

### Conclusion

We hold that plaintiff's conduct constituted ratification and waiver of her right to collect damages under the SEA and the common law; that she cannot maintain a private cause of action under Regulation T or under the NYSE or NASD rules; and that she did not meet her burden of proving that the defendants violated Rule 10b–16.

We hold further that defendants are barred from recovery under the counterclaim—the applicability of the doctrine of "unclean hands" alone makes imperative our disposition of it.

Accordingly, we are constrained to, and do, dismiss the complaint. The counterclaim is dismissed.

SO ORDERED.

---

**17.** Because we find that plaintiff is not entitled to damages, we need not address Thomson's liability for Kuznetz's conduct.