Joe D. ROBERTSON, Plaintiff,

v.

CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., and Al Steinberg, Defendants.

Civ. A. No. C82–2542A.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 26, 1984.

James A. Gober, Arnall, Golden & Gregory, Atlanta, Ga., for plaintiff.

James H. Bratton, Jr., John G. Despriet, Jane Childs Carr, Gambrell & Russell, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This action is before the court on defendants' motion for summary judgment and defendants' alternate motion for partial summary judgment. Plaintiff's complaint asserts that defendants mishandled a trade in silver futures and failed to execute properly an order plaintiff had given. Plaintiff's complaint further asserts that defendants intentionally and wilfully gave plaintiff false information in an effort to deceive plaintiff with regard to the unauthorized transaction. Plaintiff's complaint sets forth a cause of action for fraud, breach of contract, negligence, and breach of fiduciary duty. As is often true in cases such as this the facts are complicated and in sharp dispute. However, defendants argue that even under plaintiff's version of the facts defendants are entitled to judgment as a matter of law.

## I. FACTS.

### A. *The Events Prior to June 1982.*

Plaintiff in this case is a reasonably successful businessman approximately 59 years old. Although he had in the past invested in various stocks and bonds he had never invested in commodities futures prior to 1981. Robertson Deposition, Vol. I, p. 17 (April 19, 1983). During the latter part of 1980 plaintiff became interested in investing in silver when he observed the price rise to approximately $50 per ounce and then drop to approximately $10 per ounce. Plaintiff formed the belief that silver was undervalued at $10 per ounce and that the price would soon rise again. Although he had never traded in commodities before, he approached defendant Clayton Brokerage and set up a commodities account in January 1981. Paragraph 8 of the Customer Agreement which plaintiff signed on January 15, 1981 states:

> Reports of the execution of my orders and statements of my accounts shall be conclusive if not objected to in writing by me directed to the home office of the company in Clayton, Missouri, the former within three days, and the latter within ten days, after transmittal thereof to me, by mail or otherwise. (Defendant's Exhibit 2).

Another document which plaintiff signed on the same date was the customer risk disclosure statement required by Rule 1.55 of the Commodity Futures Trading Commission. This document outlines some of the risks of commodities trading and then in large, bold print states:

## NOTICE TO CUSTOMERS

Each transaction entered into on your behalf will be confirmed in writing to you no later than the business day following the day any such transaction should take place.

Should you receive a combined commodity statement which contains transactions, quantities, contract months, prices, etc. that you believe to be incorrect or inaccurate, you must immediately contact your commodity representative, or, in the event of his absence, his immediate supervisor, the branch office sales manager where your account is carried.

   ·    ·    ·    ·    ·

Please be advised that your failure in any case to follow the above procedures shall be deemed as a ratification by you of any trades which appear on any such combined commodity or monthly account statements and shall be deeded (sic) a waiver by you of any inaccuracy or incompleteness regarding the same pursuant to this Notice to Customers, your customer account application and agreement with Clayton, and otherwise.

Clayton Brokerage Co. of St. Louis, Inc. strongly recommends that you retain this notice with your account records. (Defendant's Exhibit 3).

Plaintiff opened his account with an initial deposit of $15,000 on January 14, 1981. On January 21, 1981 he bought one contract of September 1981 New York silver [1] at a price of $17.50 per ounce. By the end of the month the price had dropped to $14.60 per ounce, and plaintiff had lost $12,750.00 and been forced to contribute an additional $9,000 to meet his margin call. By the end of February the price had dropped to $13.20 and plaintiff had lost $19,750.00 on the contract. By the end of March the price had dropped to $12.66 and plaintiff had lost a total of $44,900 on two contracts for September 1981 New York silver.[2] By the end of April the price had dropped to $11.707 and the total loss on the two contracts had exceeded $54,000. The price dropped only slightly in May but by the end of June had dropped to $8.80 per ounce, and plaintiff's loss had reached $83,-500. Plaintiff finally closed these two long positions by selling the two contracts in July 1981 for a total loss of $83,001.50 plus commissions owed to his broker, Al Steinberg.[3]

Despite these enormous losses which he had incurred by remaining long in a falling market for more than six months, plaintiff, ever the optimist, believed that the price had dropped as far as it could drop and was bound to rise again soon. In August he bought two contracts for March 1982 New York silver. The price did indeed rise slightly, and plaintiff was able to realize a profit of $22,080 when he sold the contracts and closed his position on September 11, 1981. However, much of this profit was wiped out when plaintiff bought on September 15 and September 23 two contracts for December 1981 New York silver. By the end of September these two contracts had lost almost $15,000. By the end of October plaintiff had lost $37,820 on four long positions opened in September.[4]

During November plaintiff sold three contracts for December 1981 New York silver and two contracts for March 1982 New York silver for a loss of $45,780.[5] Plaintiff also bought three contracts for May 1982 New York silver on which by the end of the month he had made a slight profit to offset a $16,700 loss on his one remaining March 1982 contract.

Plaintiff's 1981 year-end statement reflects that during 1981 he had lost a total of $106,871.50 in trades which had been closed and an additional $16,940 in trades which remained open. Defendant's Exhibit 17. Plaintiff remained in a long position during January and February while the price of silver continued to drop. On February 22, 1982 he closed his long position in March 1982 New York silver for a loss of $19,010. On the same date he purchased a contract for July 1982 New York silver. By the end of the month that contract had lost another $1,450. In March 1982 plaintiff bought one contract each for July 1982 and September 1982 New York silver which, with his other long positions, resulted in a loss of $22,210.

In April plaintiff closed his three contracts for May 1982 New York silver for a

---

1. All of the contracts which Mr. Robertson purchased during the relevant period were contracts for 5,000 ounces of silver purchased on the New York Commodities Exchange. September 1981 represents the delivery period for the silver.

2. During March plaintiff transferred into account number 85137 from account number 85136 funds and a contract for New York silver which had been purchased on the same date and at the same price as the original contract in account number 85137.

3. Commissions were due whenever a position, long or short, was closed. During this period Steinberg's commission was $110 per contract.

4. Three of these contracts were for December New York silver, while the fourth was a contract for March 1982 New York silver. One of the December contracts and the March contract were transferred into account number 85137 from account number 85136.

5. Plaintiff only had one March 1982 contract to sell. By selling two such contracts he should have achieved a short position for March 1982 silver. Compare Defendant's Exhibit 14 with Defendant's Exhibit 15. However, plaintiff's November month-end statement reflects that plaintiff still had one long contract for March 1982 New York silver. This anomaly is unexplained in the record.

loss of $17,795 and replaced them with long positions in two contracts for September 1982 New York silver and two contracts for December 1982 New York silver. By the end of April 1982 plaintiff held in account number 85137 seven long positions for New York silver for varying delivery months for a total loss of $20,050. The settlement price for these various months ranged from $7.02 to $7.47.

Plaintiff kept the seven long positions through May as the price dropped to $6.295–$6.675 and his losses totaled $46,545. A fair summary of plaintiff's trading during his first year and a half would be that he had consistently bought and retained long positions as the market plummeted. During the first year and a half he had lost more than $160,000 and had been repeatedly called upon to supply additional funds to meet margin calls. Plaintiff personally directed each of the trades during this period, sometimes on the advice of and sometimes directly against the advice of his broker, Mr. Steinberg.[6] Throughout this period plaintiff remained in a long position because he expected the market to go back up. Throughout this period plaintiff's expectations proved to be both wrong and costly.

B. *The Events of June 4 Through June 18.*

After months of losing money by being long in a falling market plaintiff decided in June 1982 to employ a new strategy. On Friday, June 4, he sold seven contracts for delivery months in which he did not already have long positions established. The effect of this transaction was to put plaintiff in a "spread" position—having an equal number of long positions and short positions. By being in a spread position plaintiff was effectively immunized from further declines in the market. The money he would lose by being long would be offset by the money he would gain by being short during a period of price decline.[7] However, being in a spread position also prevented plaintiff from taking advantage of any rise in the market since gains in the long positions would be offset by losses in the short positions.

The events after June 4 are hotly disputed. However, plaintiff's version of the facts, as gleaned from his statement of material facts in dispute, his pleadings, and his deposition and that of his secretary, Katherine Reynolds, is generally as follows. On Monday, June 7, Steinberg informed plaintiff by telephone that the price of silver was rising rapidly. Plaintiff, believing that this was the long awaited upturn, became concerned that he would miss out on the profits because of being in a spread position. Plaintiff gave Steinberg a protective buy-stop order to purchase on June 8, 1982 nine March 1983 silver futures contracts (seven for account number 85137 and two for account number 85145) at a price of ten cents above the settlement price of March silver on June 7, 1982. The effect of such an order was that if the price of March silver did not rise on June 8 to a level ten cents above the settlement price of June 7, no purchase would be executed. If the price did rise to ten cents above the June 7 settlement the purchase would be executed as quickly as possible regardless of what had subsequently happened to the price. Plaintiff had never placed a protective buy-stop order before. At the time the order was placed on June 7 the market was still open, so plaintiff did not know what the June 7 settlement price would be. He thus could have no idea at what price level his trade would be executed on June 8.

---

6. At his deposition plaintiff testified:
   I discussed trades with Mr.—potential trades with Mr. Steinberg. I—anybody can be wrong in these things. We did have sort of a joke going around the office that we would sort of reverse whatever advice he gave and proceed on that basis. Anybody can be wrong. Robertson Deposition Vol. I, p. 133 (April 19, 1983).

7. Because of the slight difference in prices for the different delivery months, the gains and losses usually do not entirely cancel each other out. A short position on silver to be delivered in March may not entirely balance a long position for delivery in July.

On the morning of June 8, shortly after the market opened, plaintiff talked with Steinberg by telephone. Plaintiff contends that Steinberg told him during this conversation that since opening the market price for March silver had climbed to seven cents above its June 7 settlement price. At the time of this conversation plaintiff knew that the June 7 closing had been $6.833. During this conversation there was some discussion about raising the buy-stop order by three cents to a price of thirteen cents over the June 7 settlement price, although it is not clear that plaintiff actually gave Steinberg clear-cut instructions to do this.[8]

At approximately 10:30 that morning Steinberg called back and told plaintiff's secretary, Katherine Reynolds, that plaintiff's stop order had been filled by purchasing nine contracts for March silver at a price of $6.93 per ounce. Steinberg also told Reynolds that the price had drifted back to approximately $6.85 per ounce. Reynolds, who had opened an account with Clayton Brokerage on June 2 but had not yet placed any orders, asked Steinberg about placing an order herself. Steinberg advised against her purchasing silver at that time, but against his advice she placed an order for 1,000 ounces of December Chicago silver at the current market price. At that time she learned that the current market price for December Chicago silver was dramatically different than the price at which plaintiff's stop order had been filled.

After talking with Steinberg Reynolds relayed the information that his stop order had been filled at $6.93 to plaintiff. Plaintiff became extremely furious that his stop order had been filled at that price. The effect of the purchase was to close out plaintiff's short positions at a substantial loss and to take plaintiff out of his spread position. Further, it meant that plaintiff became obligated for commissions on the nine short contracts.

Approximately twenty minutes later, or around 11:00 on the morning of June 8, Steinberg called back to confirm that Ms. Reynolds' order for December Chicago silver had been executed at a price of $6.51. Reynolds told plaintiff about her purchase. He expressed disbelief at the price because it was so much lower than the price at which his order had been filled.[9] Plaintiff insisted that Reynolds call Steinberg back and confirm the price of her purchase. Plaintiff stood by her desk while Ms. Reynolds called Steinberg and confirmed that in fact her order for silver had been executed at $6.51. However, plaintiff does not appear to have confirmed the price at which his own trade had been executed. Reynolds Deposition Vol. 1, p. 94 (April 20, 1983).

After the market closed on June 8 Ms. Reynolds called Steinberg and got the June 8 closing prices for all the months in which plaintiff held positions and relayed this information to plaintiff. Reynolds Deposition Vol. 1, p. 111. There has been no

---

**8.** In his deposition plaintiff was asked the following:

Q: What did Mr. Steinberg say when you increased your stop order three cents?
A: He said you can't tell anything about the market in just a few minutes trading, and that he would watch the situation like a hawk. If it looked like I was going to get stopped out on June 8, he would ring me immediately. Have an opportunity to review it and change it, so he—it's my understanding he did not change the stop order price.

Robertson Deposition Vol. 2, p. 52 (April 21, 1983).

**9.** Even accounting for the different delivery months and different markets the "spread" was greater than plaintiff felt it should be. At her deposition Reynolds testified:

A: Mr. Robertson stopped at the desk again. I told him that I had just bought a contract at $6.51. He told me that was impossible. There was too much spread there, and that my confirmation would not say that, and that I ought to call Mr. Steinberg back and reconfirm that, so I did.
Q: And that was impossible even though you were dealing in different months and different markets, correct?
A: He was very much aware of normal spreads because he held so many different contracts in different months, and that, he felt, was impossible.

Reynolds Deposition Vol. 1, p. 103 (April 20, 1983).

allegation that this information was false. The June 8 settlement price for March 1983 New York silver was $6.709. Defendants' Statement of Undisputed Material facts at ¶ 10. Reynolds also asked Steinberg what the high for June 8 had been, and Steinberg allegedly told her that the high for the day for March 1983 silver had been $6.93.[10]

On the morning of Thursday, June 10, Steinberg called to notify plaintiff that he was substantially under margin and that he needed to make some margin payments. The size of the deficit was so substantial that Reynolds disbelieved it and demanded an explanation.[11] Steinberg explained the amount to her satisfaction, and she prepared the checks for Mr. Robertson's signature. Steinberg came to plaintiff's offices on the afternoon of June 10th after the market closed to pick up the checks. There was a dispute about the amount of the checks because plaintiff wanted the amount reduced to reflect an upturn in the market on June 10th. Steinberg refused to accept the smaller amount calculated by plaintiff, so plaintiff paid the requested margin call. It is abundantly clear from the record that at this time plaintiff was aware that his trade had been mishandled and was extremely upset about it. However, plaintiff made no effort to repudiate or disaffirm the trade.

Also on June 10th plaintiff received written confirmation of the complained of trades. The confirmation slip for account number 85137 shows that on June 7, 1982 seven contracts for March 1983 New York silver were purchased for a price of $6.93 and that this purchase had the effect of closing out the short position established on June 4, 1982. The statement shows that the close out resulted in a loss of $17,970 plus commissions of $770. The confirmation slip, like all defendants' confirmation slips, stated on its face in bold face letters:

IMPORTANT: KEEP THIS STATEMENT FOR TAX PURPOSES.

PLEASE REPORT ANY DIFFERENCES IMMEDIATELY.

Defendant's Exhibit 36.

As was her usual custom, Reynolds checked this confirmation slip against her notes and filed it for later reference against the monthly statement. At her deposition she testified that she failed to note the date on which the sale had been executed.

On June 9, 1982 plaintiff met with Frank Mullis, a broker for Shearson/American Express, and arranged to transfer his commodity accounts from Clayton Brokerage to Shearson/American Express. The transfer was completed on June 14, 1982. Defendnats' First Request for Admissions Number 5 and plaintiff's response.

Despite his anger over the mishandled trade plaintiff did not object to Clayton Brokerage or to Al Steinberg until June 18, 1982, when he sent a telex repudiating the trade.

## II. THE FAILURE TO OBJECT.

Even under plaintiff's version of the facts, plaintiff learned on June 8 that his trade had not been handled in accordance with his instructions. On that date he learned that the trade had been executed at $6.93 instead of $6.96. Plaintiff received written confirmation of the trade on June

---

**10.** The actual high for March 1983 silver on June 8, 1982 was $6.79. The high on June 7 had been $6.93.

**11.** During her deposition Reynolds testified:
Q: Do you recall any conversations on the 9th with Mr. Steinberg?
A: Yes. I believe it was the 9th that we had a lengthy conversation about margin call, and he said that there was one due and gave me a figure that I couldn't understand how it could be as high as it was. And as I recall, I had him explain in detail where every little piece

of this dollar value was coming from because I couldn't comprehend that he could owe that much money.

. . . . .

Can I clarify that? I believe the lengthy conversation we had was on the 10th, and it was prior to him coming to our office to pick up those checks. It was on the morning of the 10th. That afternoon, very late that afternoon, he came to pick up the checks.
Reynolds Deposition Vol. 1, p. 118, 120 (April 20, 1983).

10. However, despite the clear warnings in his customer agreement and on his confirmation slips, plaintiff made no effort to object to or repudiate the trade until June 18. Plaintiff's stated explanation for his failure to object within the required three days has been that defendant Steinberg fraudulently misled plaintiff as to the price of silver on June 8 and the direction in which the price was moving. In other words, Steinberg allegedly induced plaintiff to believe that although a mistake had been made the mistake was working to plaintiff's benefit and that therefore plaintiff saw no need to complain.

The Commodities Futures Trading Commission has taken an especially dim view of investors who make no effort to repudiate a mishandled trade until it becomes apparent that the trade has resulted in a loss. In *McManus v. Siegel Trading Co.* (1977–80 Tr. Binder) Com.Fut.L.Rep. (CCH) ¶ 20,-551, p. 20, 264 (1978), the CFTC stated:

> The complainant, after being informed by respondent that a trade had been entered was not privileged to wait the outcome before claiming that it was unauthorized. His only protest came five days after the loss was established. His failure to repudiate the transaction constituted a ratification, which is a complete defense to his claim of a statutory violation.

*Id.* (citing *Lincoln Commodities Services v. Meade*, 558 F.2d 469 (8th Cir.1977); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417 (N.D.Cal.1968); *Merrill Lynch v. Bocock*, 247 F.Supp. 373 (S.D.Tex.1965); Restatement (2d) of Agency §§ 93–94 (1957)).

The reason for requiring immediate action to repudiate a mishandled trade is that the CFTC has held that a mishandled trade belongs to the broker. The broker is the one who bears the loss or enjoys the profit and should have the opportunity to take steps to minimize the damage. The CFTC has held that it would be patently unfair to allow the investor who is aware that a trade has been mishandled to wait and see how it turns out before objecting.

The customer agreement which plaintiff signed required written notice of any objections to be sent to Clayton Brokerage's St. Louis office within three days of the receipt of the written confirmation of this transaction. Plaintiff received written confirmation of the transaction on June 10 but failed to send written notice of his objections until June 18. While eight days may not seem to the layman like an unreasonable delay, in commodities trading it is an eternity. As the Eighth Circuit Court of Appeals stated in upholding a requirement that margin calls be paid within one hour,

> [a] position in the market is not a long-term investment to be made and thus thought about at infrequent intervals. Commodities trading requires daily, and at times constant, attention. *Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 578 (8th Cir.1975).

The transaction at issue in this case involved 45,000 ounces of silver valued in excess of $300,000 and subject to daily price changes of 50 cents per ounce per day, or $22,500 per day for the nine contracts. On these facts the court cannot say that the requirement that written notice of repudiation be sent within three days is unreasonable. If plaintiff was aware of the mishandled trade then he had an absolute duty to object in writing within three days after receipt of written confirmation of the trade. Under applicable law his failure to do so would constitute a ratification of the trade.

Plaintiff, however, has alleged that Steinberg fraudulently concealed his mishandling of the trade by wilfully giving plaintiff false information as to the date of the transaction and as to the level and direction of the market price for silver. Plaintiff alleges that he relied to his detriment on these fraudulent representations in failing to complain within three days and that he did in fact complain in writing within three days of learning the true facts. If in fact Steinberg made fraudulent representations upon which plaintiff could reasonably have relied in failing to

contest the trade, then the court believes that plaintiff's failure to complain cannot be said to constitute a ratification of the trade. It is Hornbook law that a party who is induced to enter into a contract on the basis of fraudulent misrepresentation by the other party may treat the contract as voidable. *See* Restatement (2d) of Contracts § 164 (1979). Since the failure to complain about the trade within three days is regarded as a "manifestation of assent," *id.*, the customer may treat the ratification of the trade as voidable if the failure to complain was induced by fraudulent misrepresentations on the part of the broker. However, if after relying upon the fraudulent misrepresentations plaintiff learns the true facts and still fails to complain he will in fact have ratified the trade. Once the customer has knowledge of the true facts he can no longer claim that his failure to complain is induced by reasonable reliance upon the earlier fraudulent misrepresentations.

In the present case there are clearly factual issues in dispute as to whether defendant Steinberg misrepresented the date of the trade or the level and direction of the market price of silver on June 8, 1982. However, it is undisputed that on June 10 plaintiff received a written confirmation slip which disclosed that the trade had been executed on June 7. Whether Steinberg falsely told plaintiff that the trade had been executed on June 8 becomes irrelevant after June 10. The confirmation slip contained the true facts. Plaintiff had an affirmative duty to read the confirmation slip and report any disputes or inaccuracies. Plaintiff cannot be said to have reasonably relied after June 10 on any prior verbal misrepresentations as to the date of the trade.

As to whether plaintiff reasonably relied on any misrepresentations as to the level and direction of the market on June 8, the record is in conflict. Plaintiff's affidavit states that he in fact relied upon defendant Steinberg's representations that the market was rising on June 8 in failing to object to the trade. Plaintiff argues that since he believed he was making a profit on the

mishandled trade he saw no reason to complain. The problem is that plaintiff's affidavit is contradicted by his own deposition and by that of his secretary, Mrs. Reynolds. These depositions contain testimony supporting the following propositions: (1) Steinberg told plaintiff on the morning of June 8 that his trade had been executed at $6.93; (2) plaintiff learned at the same time that the price had "drifted" back some from $6.93; (3) shortly thereafter plaintiff learned that his secretary had purchased silver for a price significantly below the price at which his trade had been executed; (4) plaintiff demanded that Ms. Reynolds call Steinberg back and confirm the price of her trade and stood by her desk while she did so; (5) after the market closed on June 8 plaintiff learned that the closing price for March 1983 New York silver was $6.709; (7) plaintiff also alleges that he was told at this time that the *high* price on June 8 for March 1983 silver was $6.93; (8) on June 10 plaintiff was told that he had to pay substantial margin calls; (9) Ms. Reynolds, who could not believe that plaintiff owed that much money, required Steinberg to account for every penny of the margin calls; (10) plaintiff paid the margin calls; (11) finally, plaintiff met with another broker and transferred his account on June 9. All of these facts gleaned from plaintiff's testimony and that of Ms. Reynolds, plus the additional fact that plaintiff became extremely angry when he learned of the trade on June 8 because he realized he was long *in a falling market*, see Robertson Deposition Vol. 2 at p. 60, line 14 (April 21, 1983), clearly contradict any finding that plaintiff's failure to act within three days of receiving the June 10 confirmation slip was in reasonable reliance upon any representation by Steinberg that the market price on June 8 was rising.

■ While it is not the purpose of a court on summary judgment to weigh the facts, the court does not believe the facts of this case as presented by the testimony of plaintiff and his secretary, support any reasonable inference that plaintiff's failure to complain in writing until June 18 was

because of reasonable reliance on any fraudulent misrepresentations by defendants. Even if any fraudulent misrepresentations were made on June 8, plaintiff clearly had knowledge of the true facts, or enough of the true facts to negate the reasonableness of any reliance, by June 10. The failure to complain within three days of that date constitutes a ratification of the trade under plaintiff's customer agreement and applicable law. *See McManus v. Segal Trading Co., Inc.* [1977–80 Tr. Binder], Com.Fut.L.Rep. (CCH) ¶ 20,551, p. 20,264 (1978). Defendants' motion for summary judgment is, therefore, GRANTED.

Because of the court's decision to grant defendants' motion for summary judgment it is unnecessary to consider defendants' Alternate Motion for Partial Summary Judgment. .That motion is therefore DENIED as moot.

III. CONCLUSION.

In sum, Defendants' Motion for Summary Judgment is GRANTED. Defendants' Alternate Motion for Partial Summary Judgment is DENIED as moot.