**In re The DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**The DBL LIQUIDATING TRUST, Appellant,**

**v.**

**CLARKSON CONSTRUCTION COMPANY, Appellee.**

**Nos. 90 Civ. 6954 (MP), 93 Civ. 4022 (MP) and 90 B 10421 (FGC).**

United States District Court, S.D. New York.

Aug. 6, 1993.

George Wailand, Gregg Kanter, Cahill Gordon & Reindel, New York City, for appellant DBL Liquidating Trust.

Mark G. Arnold, Mark G. Flaherty, Husch & Eppenberger, St. Louis, MO, for appellee Clarkson Constr. Co.

## OPINION

MILTON POLLACK, Senior District Judge:

DBL Liquidating Trust ("Drexel") appeals the denial by Francis G. Conrad, *Bankruptcy Judge*, of a motion for summary judgment in its favor on a claim filed by Clarkson Construction Company ("Clarkson") in Drexel's bankruptcy proceedings. This appeal is by grant of leave from this Court. The issue is whether as a matter of law Clarkson ratified approximately 3,000 trading transactions made in a brokerage account over a four-and-a-half year period by failing to object thereto at any time during that period although expressly required by its brokerage contract to do so within days of receiving written confirmation notice of a trade. Clarkson's defense to the motion is based on its receipt of numerous oral reports on the market which frequently included the statement that "nothing much was going on," and the contention that these reports deceived Clarkson into believing that its account was being conducted and confirmed by telephone, thereby excusing Clarkson from its obligation to examine its confirmation notices and object in writing to any disputed trades in the account.

**Reversed.**

## I. BACKGROUND

On July 24, 1984, Clarkson opened a corporate commodities trading account (the "Account") with Drexel. The Account was activated and governed by the standard-form Commodity Customer Account Agreement (the "Account Agreement" or "Agreement"). The Agreement was signed by both Clarkson President and C.E.O. William E. Clarkson ("Bill Clark-

son"), and Clarkson comptroller Robert Snapp.

On the same day Clarkson opened the Account, Clarkson's board of directors adopted a resolution that comptroller "Robert B. Snapp, Jr. ... is hereby authorized to receive and acquiesce in the correctness of the notices of transactions, statements of account and other records and documents" relating to Clarkson's Account with Drexel. Written daily confirmation notices for all transactions and monthly statements of the Account were regularly mailed to and received by Clarkson, and delivered to Snapp.

The Account Agreement provides:

2. Except as expressly provided herein, no provision of this agreement shall in any respect be waived, altered, modified or amended unless such waiver, alteration, modification or amendment is committed to writing and signed by an authorized officer of your company....

21. .... No waiver or amendment of this agreement may be implied from any course of dealing between you and the undersigned or from any failure or delay by you to exercise or assert your rights under this agreement.

The Account Agreement further provides that:

14. Reports of the execution of orders and statements of the accounts of the undersigned shall be conclusive and deemed ratified **if not objected to in writing** (to the attention of Branch Office Manager), the former within two days, and the latter within five days, after forwarding by you to the undersigned by mail or otherwise. (emphasis added.)

Drexel sent daily confirmation notices to Clarkson for each transaction containing the following notification:

PLEASE REPORT IMMEDIATELY TO THE OFFICE SERVICING YOUR ACCOUNT ANY INACCURACIES, DIS- CREPANCIES, OR ERRORS APPEARING ON THIS STATEMENT.

The opposite side of the notice also stated: ANY INACCURACIES, DISCREPANCIES, OR ERRORS MUST BE IMMEDIATELY REPORTED TO YOUR ACCOUNT EXECUTIVE AND BRANCH OFFICE MANAGER AND FOLLOWED BY WRITTEN NOTIFICATION NO MORE THAN 5 DAYS FROM THE DATE OF THIS STATEMENT TO THE OFFICE HANDLING YOUR ACCOUNT. FAILURE TO NOTIFY CONSTITUTES YOUR RATIFICATION OF THE TRANSACTIONS.

Trading in the Account was overseen by a Drexel account representative, Thomas W. Carpenter. In servicing the Account, Carpenter communicated regularly by telephone with Company President Bill Clarkson about the state of various markets. Bill Clarkson had informed Carpenter at the beginning of the relationship with Drexel that due to the press of his business his method of communicating with professionals was via telephone.

Clarkson maintains that from September of 1984 through April of 1989, over 3,000 unauthorized transactions took place in the Account, representing trading in stock index futures and commodities such as sugar futures, cattle futures, and international currency. Bill Clarkson's original objective was to trade in precious metals.

Written daily confirmations and monthly statements were provided by Drexel documenting each and every one of the 3,000 allegedly unauthorized transactions. Neither Snapp, Bill Clarkson, nor any other Company official ever objected, orally or in writing to any of these 3,000 allegedly unauthorized trades or complied with the customer Account Agreement by repudiating any or all of them, in four-and-a-half years.

Clarkson's claim centers on Carpenter's practice of phoning Bill Clarkson to report to him (or leave word with his secretary) regarding developments in the markets and discuss transactions. Carpenter frequently left messages for Bill Clarkson indicating that "nothing much was going on" in the

market. Telephone records maintained by Clarkson reflect that on 113 separate occasions over the approximately 1500 days involved Carpenter reported that "nothing much was going on" when transactions had been executed in the Account. Clarkson contends that Carpenter's phone calls to Bill Clarkson led him to believe that Carpenter was following instructions and actively looking after the Account. The record on appeal presents **no evidence** relating to any specific mention or discussion between Carpenter and Bill Clarkson regarding any of the 3,000 transactions now disputed, or concerning the daily confirmation notices thereof, or the monthly statements reporting each and every transaction during the period, or the investment systems being utilized in the Account.

On November 13, 1990, Clarkson filed a proof of claim in the Drexel bankruptcy to recover losses which allegedly resulted from the alleged unauthorized trading. On March 5, 1993, Drexel filed a motion for summary judgment in Bankruptcy Court seeking dismissal of this claim. On April 15, 1993, the Bankruptcy Court held a hearing on Drexel's motion, during which the following exchange took place between the Court; counsel for Clarkson, Mr. Arnold; and counsel for Drexel, Mr. Wailand. Without adverting to the Agreement's ratification, modification, or objection provisions; the testimony of Mr. Snapp; or the resolution of Clarkson's board of directors, the Bankruptcy Court judge stated:

> The COURT: All right, this is treated as a Rule 56 motion on an objection, motion to disallow and expunge the claim.
>
> Based upon the facts I have before me. and I think these are—and they are almost totally uncontested with the exception of one area, Mr. Clarkson, had a commodities account with DBL, Inc., DBL sent Clarkson confirmation notices which reported the execution of each trade, there were monthly statements which were sent to Clarkson reflecting all transactions that occurred.
>
> The reports also include a disclaimer (sic) on the back that if the party did not give written notification of the error

within five days it would immediately ratify the transaction.

> Apparently, over a five year period Mr. Clarkson did not object to what he alleges is unauthorized trading.
>
> The Clarkson account apparently was nondiscretionary in that both Mr. Clarkson and the Drexel account executive, a Mr. Carpenter, understood that Mr. Clarkson's prior approval was required to engage in trades and that Clarkson permitted Carpenter to invest in precious metals. . . .
>
> ARNOLD: Well, my position, Your Honor—my position is that over that five year period the reason why there was no written objection filed was because of a virtually daily pattern of deception and fraud that was practiced by the Drexel broker on Mr. Clarkson.
>
> That pattern of deception consisted of two things, one affirmative misrepresentation, a statement to Mr. Clarkson that is documented in the Clarkson telephone logs that nothing much is happening today, while at the very time the broker engaged in multi-million dollar trade[s] on an unauthorized basis.
>
> The COURT: Counsel, I agree with you. I think that's an issue that has to be raised at trial. . . .
>
> I think that's a material fact here. . . .
>
> So your motion for summary judgment is denied. . . .
>
> The COURT: You understand, I mean the reason for the denial of the summary judgment is I don't know what went on at those telephone conversations and it could have been affirmative fraud and I think that's something that we'll have to see about what happens.
>
> I understand that there are problems, that there was an accountant that was delegated to look at some of this stuff and those are factual issues that have to be resolved.

In accordance with its determination at the hearing, the Bankruptcy Court issued an order of May 3, 1993 which stated:

> WHEREAS the motion for summary judgment addressed the threshold issue

of whether Clarkson's claim should be disallowed for the failure to make timely objections to the allegedly unauthorized trades; and

WHEREAS the Court heard argument on the DBL Trust's motion on April 15, 1993; now therefore, it is

ORDERED that the DBL Trust's motion for summary judgment pursuant to Bankruptcy Court Rule 7056 is DENIED for the reasons set forth in the transcript of the argument on the motion.

On May 10, 1993, Drexel filed a notice of appeal from this interlocutory order, and on May 25, 1993 this Court entered an order granting Drexel leave to appeal.

## II. ANALYSIS

■ Appellate courts "review a grant [or denial] of summary judgment *de novo*, examining the evidence and the inferences to be drawn therefrom in the light most favorable to the party opposing the motion." *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

■ To prevail on a motion for summary judgment, the moving party must establish that "there [is] no *genuine* issue of *material* fact" as to any essential element of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). When a moving party has met its initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-movant to go beyond the pleadings and come forward with specific facts showing there is a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Celotex v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986).

In considering the motion for summary judgment, the Bankruptcy Court failed to account for the express terms of the Account Agreement between the parties. This Agreement expressly provides: (1) "no provision of this agreement shall in any respect be waived, altered, modified or amended unless ... committed to writing and signed by an authorized officer...."; (2) "[n]o waiver or amendment of this agreement may be implied from any course of dealing between you and the undersigned;" and, (3) "[r]eports of the execution of orders and statements of the accounts of the undersigned shall be conclusive and deemed ratified if not objected to in writing." The Court also failed to mention the Board of Director's resolution, which named Mr. Snapp as the individual with respect to this account "authorized to receive and acquiesce in the correctness of the notices of transactions, statements of account and other records and documents." Clarkson failed to respond to this evidence by coming forward with the "specific facts" necessary to support a triable issue of fact. *See Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. at 1356.

The requirement of prompt written notice of repudiation of trades has long stood as a pillar in the law of customer-broker relations. *See, e.g., Leviten v. Bickley, Mandeville & Wimple*, 35 F.2d 825, 827 (2d Cir.1929) ("The principle of ratification has frequently been applied in litigation involving the unauthorized purchase or sale of stocks held on margin by brokers ..."); *Modern Settings, Inc. v. Prudential–Bache Sec., Inc.*, 936 F.2d 640, 645–646 (2d Cir.1991); *Jaksich v. Thomson McKinnon Secs.*, 582 F.Supp. 485, 502 (S.D.N.Y.1984) (by failure to object "plaintiff ratified and waived the purchases of the stocks."); *Altschul v. Paine, Webber, Jackson & Curtis*, 518 F.Supp. 591, 594 (S.D.N.Y.1981) ("By failing to object to the course of trading in the accounts for approximately two years ... the Altschuls must be held to have ratified the transactions ..."). As stated by the Second Circuit Court of Appeals:

The writing requirement of the clause insures that unauthorized trading disputes are not relegated to "swearing contests" between broker and customer. For these reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation

of the transaction generally have been enforced by the courts. *Modern Settings, Inc. v. Prudential–Bache Sec., Inc.,* 936 F.2d at 646.

Clarkson contends however, that Bill Clarkson's indication of his preference to communicate with the account executive by telephone because of the press of business, and the account executive's subsequent phone calls to Bill Clarkson, modified or waived the express non-waiver agreement in the Account Agreement and the ratification provision therein, and excused compliance with these terms through the doctrine of equitable estoppel.

### A. *Modification of the Agreement:*

█ Clarkson's contends that Bill Clarkson's statement to Carpenter that because he was pressed for time he preferred communicating with Carpenter by telephone, and Carpenter's subsequent practice of contacting Bill Clarkson by telephone, modified or obviated the Account Agreement. However, such an attempted modification is expressly excluded by the terms of the Agreement.

Paragraph Two of the Agreement provides:

> no provision of this agreement shall in any respect be waived, altered, modified or amended unless such waiver, alteration, modification or amendment is committed to writing and signed by an authorized officer of your company.

Paragraph 21 of the Agreement further provides:

> 21. .... No waiver or amendment of this agreement may be implied from any course of dealing between you and the undersigned or from any failure or delay by you to exercise or assert your rights under this agreement.

The case law in New York and other jurisdictions unequivocally supports terms of a brokerage contract which require any modification to be in writing and signed by the broker. *See Klapp v. Bache,* 229 A.D. 415, 242 N.Y.S. 155, 159 (3d Dep't), *aff'd,* 255 N.Y. 550, 175 N.E. 308 (N.Y.1930) (regardless of broker's prior specific oral no-

tices to customer, customer did not "have any right to rely upon a waiver [of right to act without notice], because the agreement said he would not do so."); *National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 676 (S.D.N.Y.1991), *aff'd,* 962 F.2d 1 (2d Cir.1992) ("An alleged oral agreement subsequent to, and in derogation of, an agreement containing such a 'no oral modification' clause can neither modify, nor create a triable issue of fact with respect to, the written agreement."); *D.L. Baker & Co. v. Acosta,* 720 F.Supp. 615, 618 (N.D.Ohio 1989) (court finds that "even assuming the existence of an oral agreement dictating the terms of liquidation of stock, any such agreement is entirely ineffective as the Customer Agreement clearly and unambiguously prohibits oral modification of its terms."); *Stotler & Co. v. Khabushani,* 703 F.Supp. 738, 740 (N.D.Ill.1989). The purported modification in this case was neither documented in writing nor signed by the broker.

Furthermore, New York statutory law, which by contractual provision governs enforcement of the Agreement, provides that:

> [a] written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

N.Y.Gen.Oblig.Law § 15–301(1) (McKinney 1989). This statute and the relevant case law affirm unequivocally that under the Agreement's "no oral modification" and ratification provisions, Bill Clarkson and Carpenter's words and actions have no effect in the face of the Agreement's express provisions to the contrary requiring timely, written objection to any questioned transactions. Clarkson has not asserted that it was unaware of the daily confirmations, monthly statements, recorded entries in Clarkson's accounts, and financial reports to the directors and Internal Revenue Service, all embracing the disputed transactions. To the contrary, Bill Clarkson admitted in his deposition that he received and reviewed the monthly and annual fi-

nancial reports which reflected the results of these transactions, and in fact "accepted them [the figures] at the time." *See* Clarkson Deposition of Feb., 1993 ("Clarkson Dep."), Joint Appendix, 1037. On argument, Company counsel conceded that all these transaction results also were reflected in Clarkson's tax returns.

### B. *Equitable Estoppel:*

■ Clarkson further maintains that Carpenter's daily practice of reporting on the market to Bill Clarkson by telephone equitably estops Drexel from invoking ratification as a matter of law. In *Modern Settings, Inc. v. Prudential–Bache Sec., Inc.*, 936 F.2d 640 (2d Cir.1991), the Second Circuit Court of Appeals re-affirmed the general rule requiring timely, written objection to disputed transactions, but also alluded in dicta to the possibility of an exception to the rule in cases involving fraud. The *Modern Settings* Court ruled that even where unauthorized trading does take place, the plaintiff is deemed to have ratified the trades by conduct and by non-compliance with the agreement it has made with the broker. *Id.* at 645 (trades were ratified because customer "did not object to the trades in writing within ten days of receiving his account statement as he was bound to do under the customer agreement.").

After making this determination, the Court in *Modern Settings* went on to state that its decision did "not foreclose the possibility that a broker may be estopped from raising a defense based on the written notice clause if the broker's own assurances or deceptive acts forestall a customer's filing of the required written complaint." *Id.* at 646. The Court noted that "the circumstances of the present case [*Modern Settings*] do not implicate these concerns." *Id.* This observation appears equally true in the case now before this Court. Nevertheless, to avoid summary judgment Clarkson contends that Carpenter's phone calls reporting the market are the type of "as-

surances or deceptive acts" described by the court in *Modern Settings.* This stretched contention would strip the express provisions of the Agreement between the parties that precludes modification without a signed, written amendment, and deems ratified the transactions that are not objected to through timely written complaint.

■ Equitable estoppel, as interpreted by the Second Circuit Court of Appeals involves: "(1) material representation, (2) reliance, and (3) damage." *See Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993).

The facts of this case do not support Clarkson's theory of estoppel. In his Affidavit of March 24, 1993 ("Clarkson Aff."), Bill Clarkson contends that he and Carpenter never discussed trading in stock index futures or non-metal commodities over the four-and-a-half year period. *See* Clarkson Aff., ¶ 10 ("In none of those calls did he advise me that he was trading ... in stock index futures, or in any commodities other than precious metals.") The phone logs submitted by Clarkson describe Bill Clarkson's phone calls as consisting almost entirely of general updates about market conditions. *See* Clarkson Construction Telephone Records ("Phone Logs"), Joint Appendix 1273–1310, 1360–1446. Neither Bill Clarkson's sworn testimony nor Clarkson's phone logs contains any evidence Carpenter and Bill Clarkson ever mentioned any of the 3,000 disputed trades; the daily confirmation notices and monthly statements received by Clarkson and reflected in its accounts, the audits thereof, and tax returns; or any objection to any of the trades. *See* Clarkson Dep.; Clarkson Aff.; Phone Logs, Joint Appendix 1273–1310, 1360–1446. Bill Clarkson further admitted that as C.E.O. he reviewed Clarkson's monthly and annual financial statements, which reflected the profit and loss in the Account for each of the 55 months in which the allegedly unauthorized trading took place.[1]

---

1. In Clarkson's Deposition, the following exchanges took place:

Q: Does the board of directors on occasion review financial statements of the company at meetings?
A: Oh, I think we have, yes.

As alluded to previously, Bill Clarkson also admitted that upon reviewing annual financial statements which reflected the results of transactions in the Drexel Account, he "accepted them [the profit or loss figures] at the time." *See* Clarkson Deposition of Feb., 1993 ("Clarkson Dep.") at 853. In light of these admissions, it is legally unfathomable that Bill Clarkson could presume Carpenter's phone calls to excuse Clarkson from its contractual obligation to diligently review the confirmation notices and statements and object in a timely fashion.

In addition to these admissions, the record contains two letters Drexel sent to Clarkson focusing on the accuracy of its account statements. The first of these letters, dated December 1, 1986, stated:

> In conjunction with the annual examination of our financial statements by our independent public accountants, Coopers & Lybrand, we would appreciate if you would review your November, 1986 commodity statement which accompanied this letter. Please us the reverse side of this letter to describe any errors. . . .

The second letter, dated November 14, 1988 and sent from Branch Manager David Smith to the attention of Bill Clarkson, stated:

> Q: Do you know if that has been the case at any time from 1984 through 1989?
> A: Yes, I have sat with my sons who were the co-owners with me. We have gone through them. And with our accountants. . . .
> Q: In addition to periodic reports on separate projects, does your company have internal monthly income statements?
> A: Yes.
> Q: Do you review those personally each month?
> A: Yes. . . .
> Q: The monthly statement that you receive would contain information regarding the internal financials of the company from all of its activities, is that correct?
> A: That is correct.
> Q: And that would include financial information regarding the company's investments, is that correct? . . .
> A: Yes, I am sure that is right. . . .
> Q: This is the second page of the statement of income for a particular month, that being July of 1984, is that correct?
> A: Uh-huh. I mean yes.

As the Branch Manager, it is my responsibility to periodically review customer accounts to determine they are being handled in a manner satisfactory to our client's desires and investment objectives. In this connection, I discussed your account with your Account Executive, Tom Carpenter. I trust that each transaction was handled in accordance with your instructions.

Clarkson's theory of equitable estoppel is further undermined by the fact that Bill Clarkson was not the individual designated to review Account transactions. By resolution of Clarkson's Board of Directors, Snapp was "authorized to receive and acquiesce in the correctness of the notices of transactions, statements of account and other records and documents." This resolution was apparently accorded with what Snapp acknowledged was a general "understanding that anything that came addressed to Clarkson Construction Company that related to investments was routed to" Snapp. Deposition of Robert Snapp dated May, 1990 ("Snapp Dep."), Joint Appendix 978. Snapp was clearly qualified to retain such authority, holding "a bachelor's in economics and a bachelor's in business administration, and some additional graduate courses in business," and having "experience in the field of auditing companies'

> Q: Do you note that there is a line item for Gain or Loss on Investment Transactions?
> A: Yes.
> Q: And did you, when you reviewed this kind of document from month to month, take notice of that figure?
> A: I don't recall. I am sure I looked at it.
> Q: It would in fact be something that you would have done, would you not, in terms of evaluating the financial status of the company?
> A: I would have probably looked at it, yes. . . .
> Q: Does it also include as the last two sheets the statement of income for the period ending April 30, 1985?
> A: Yes, it does.
> Q: Again, is this the kind of document that you would have reviewed as president of the company, Mr. Clarkson?
> A: Yes.
> Q: . . . Do you see where it says in Exhibit 3 for Current Assets Commodity Accounts?
> A: Yes. . . .
> *See* Clarkson Dep., Joint Appendix, 1013–1025.

financial statements." Snapp Dep., Joint Appendix 972–973.

Snapp testified that "on a monthly basis ... [he] would review the daily transaction sheets and monthly statements" from Drexel, but he "never did report any trades as unauthorized to Drexel ..." Snapp Dep., Joint Appendix 970, 982. Snapp further acknowledged that "Clarkson Construction Company's books and records from July 1984 through April 1989 at any point in time reflected the gains or losses from commodities trading in the Drexel Burnham commodities account." Snapp Dep., Joint Appendix, 995. Although Snapp was contacted by Carpenter on occasion with respect to margin calls and requests for additional funds, Snapp admitted that he never asked Carpenter what the funds were needed for or what particular commodities had been traded.[2] Neither Clarkson's pleadings nor Snapp's deposition testimony make any suggestion that Snapp and Carpenter ever discussed any transactions or other substantive issues related to the Account. This testimony establishes conclusively Carpenter's phone calls to Bill Clarkson in no way materially affected or impaired the review of the confirmation notices and monthly statements by Snapp, the qualified individual designated by the board to make such a review.

In light of the board of director's resolution and Snapp's testimony, and absent any specific evidence whatsoever of representations concerning Account transactions or confirmation statements, there is no legal basis for applying equitable estoppel to 3,000 separate transactions that took place over a four-and-a-half year period. This Court concludes that no rational trier of fact could find that Carpenter's alleged representations provided a basis for setting aside the express contractual provisions. The Court finds Clarkson's claim for equitable estoppel insufficient as a matter of law. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than show some metaphysical doubt as to the material facts.* * * if the factual context renders respondent's claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.* * * Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " (citations omitted)); *Dillman v. Combustion Engineering, Inc.,* 784 F.2d 57, 61 (2d Cir.1986) (affirming grant of summary judgment on the basis that "no jury reasonably could find the requisite grounds for invoking ... equitable estoppel"); *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48 (2d Cir.1988) (same); *Cerbone v. International Ladies Garment Worker's Union,* 768 F.2d 45, 50 (2d Cir.1985) (same).

The cases cited by Clarkson in support of estoppel do not conflict with our conclusion. *See Cange v. Stotler & Co.,* 913 F.2d 1204, 1206–1207 (7th Cir.1990) (broker expressly told customer to ignore statements reporting unauthorized transactions because they would be corrected); *Eichler v. S.E.C.,* 757 F.2d 1066, 1068–1070 (9th Cir. 1985) (broker falsely reported that he was unable to fill market orders for stock). In these cases, there was a close nexus between the broker's representations regarding specific trades and the customer's failure to object to those trades. No such nexus exists in this case, where Carpenter's very general comments made no ref-

---

**2.** Specifically, Snapp testified as follows:

Q: During any of these conversations with respect to margin calls or requests for additional funds did you ever question Tom Carpenter or Bill Clarkson as to why the funds were needed? ...

Did you ever ask Mr. Carpenter or Mr. Clarkson what the funds were needed for?

A: No, it was my belief that they were needed, and I didn't question them, no.

Q: You never asked either Mr. Carpenter or Mr. Clarkson what particular commodities had been traded that resulted in the call to have been issued?

A: I do not recall any specific time that I did, no.

Snapp Dep., Joint Appendix, 996.

## 548

erence whatsoever to specific trades or to the objection process.

The timely written objection provision was written into brokerage contracts to free brokers from liability for their customer's lack of diligence in reviewing their account. As a matter of law, the general comments allegedly made by Carpenter can not excuse Clarkson's blatant disregard of the review and objection procedures expressly described in the Agreement and confirmation notices. *See Robinson v. Pan American World Airways, Inc.,* 645 F.Supp. 70, 73 (S.D.N.Y.1986) ("The Second Circuit has repeatedly upheld the district court's determination of equitable estoppel issues through the summary judgment mechanism.").

### C. *Conclusion:*

Clarkson's claim does not present a triable issue of fact on either the oral modification or equitable estoppel theories, or the issue of ratification. *Modern Settings* determined that a broker's oral assurances that stock would be sold that week did not excuse the customer's subsequent failure to file a timely, written objection as required by the brokerage contract. *See also Robertson v. Clayton Brokerage Co.,* 587 F.Supp. 678, 685 (N.D.Ga.1984) (Plaintiff can not have reasonably relied on any prior oral misrepresentations because he "had an affirmative duty to read the confirmation slip and report any disputes or inaccuracies."); *Jaksich v. Thomsom McKinnon Secs., Inc.,* 582 F.Supp. 485 (S.D.N.Y.1984) (holding plaintiff ratified unauthorized trade).

The Bankruptcy Court erred in failing to grant Drexel's motion for summary judgment because Clarkson has failed to come forward with specific facts showing there is a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985). Accordingly, the Bankruptcy Court's order denying summary judgment is

**REVERSED.** Judgment shall be entered by the Bankruptcy Court, dismissing the claim, with costs.